MR. FIELD: Yes, that's a better definition.
Q. Now, let me -- again, I've read your file and I've looked through things. From what I've seen, it looks like you, you had three traffic violations for driving without a license?
A. Yes.
Q. One was in February 2005; is that correct?
A. Yes.
Q. And another was in April 2005?
A. Yes.
Q. And then another was in June 2005?
A. Exactly, yes.
Q. Now, for those three, it looks to me like you have pled nolo to each of those offenses. Is that accurate?
A. Yes.
Q. Okay. You understand what I'm saying to you?
A. Yes.
Q. Now, with the exception of those three, were there any other -- let me ask it this way. Strike that. With the exception of those three, were there any other times that criminal charges were ever leveled against you or made against you?
A. No.
Q. Except for those three instances that we're talking



EXHIBIT
tabbies
C

Q. The officer pulled you over, and correct me if I'm wrong, asked you for your license and registration at that point?
A. Yes.
Q. And it was at that point that -- let me ask you what you said. I know you kind of went over this already but let me just ask you again what you told him.
A. What I told him is that -- he didn't ask me for my license and registration. I told him that I didn't have a license and registration. So after that, that was the only thing I said.
Q. And --
A. Pretty much.
Q. What did he say after you had said that you don't have a license or registration?
A. He asked me for my ID, and I told him that I didn't have a Rhode Island ID because I just lost it. Gave him my Texas ID and he asked for my Social Security number.
Q. And you gave him your Social Security number?
A. Yes.
Q. Was there one police car or were there more than one police cars?
A. After he pulled me over, it was more than one.
Q. How many cars in total?

A. Three.
Q. And do you know how many officers there were?
A. Three officers.
Q. One in each car?
A. Yes.
Q. And did you deal with all three officers or did you only have dealings with one officer?
A. Only with one.
Q. Okay. And do you know who that officer was?
A. No.
Q. Was that officer a man or a woman?
A. Man.
Q. And was there anybody else in your car?
A. No.
Q. So, after you gave the officer your Texas ID and your Social Security number, what did the officer do next?
A. He went to a patrol and checked my information. Then he came back and told me that I have an outstanding warrant.
Q. Was that the first time you learned about the warrant?
A. Yes.
Q. Was there any discussion at this point about an INS detainer?
A. No.

Q. Who handed you the document?
A. The secretary of the lady in the middle of the -- I don't know how to explain it.
Q. Another -- a woman court officer?
A. Yes.
Q. Okay. And we may go back a couple steps but let me just, to get this clear in my head. You said that you were pleading guilty?
A. Yes.
Q. And, I'm sorry, what happened after that point? I may have asked you this already but let me ask you again.
A. They handed me those papers to sign them.
Q. Did the judge say anything to you at that point?
A. No, he didn't.
Q. Did anybody else say anything to you at that point?
A. Oh, let me rephrase that. The judge said that I had INS problems, immigration problems.
Q. Now, he said that to you after you pled guilty?
A. Yes.
Q. Okay. What -- did you say anything after the judge said that?
A. No, I didn't.
Q. Okay. Now, after you pled guilty, the judge said that you had INS problems, was there anything else that the

Q. Okay.
A. So, as soon as he said that, I noticed that INS sign below the fine number, and later on, the officer next to me, I was cuffed at the time, he told me -- he brought me back inside and put me in the small cell.
Q. Okay. Let's go through this a little bit slower. You signed the paperwork?
A. Yes.
Q. And it was at this point that the judge said that you had INS problems?
A. Yes.
Q. What happened after the judge said you had INS problems?
A. The officer next to me called me and guide me back inside the cells.
Q. Now, was this the same officer that brought you up to the judge?
A. Yes.
Q. And this was the officer that you described as dark skin, chubby?
A. Yes.
Q. Okay. Now, he brought you back to the cell. Did he bring just you or did he bring other people, too?
A. Just me.
Q. Now, from the time that you -- from the time that you

Adult Correctional Institution."

And I was like, "What?"

"Yeah, they're gonna transfer us right now to over there."

And as soon as I hear that, I tried to call one of the other officers. And he was a different one. And I tell him that I can pay that fine, and that I'm a U.S. citizen, and I didn't know what INS, it was for at that time.

And he said, "You should know."

And I said, "Well, I don't know, what does that mean? Tell me because they telling me that it's immigration but I'm not sure."

Q. Okay.

A. So he said, "Yes, it is."

Q. Did you have any other conversation with this officer?

A. Yes.

Q. What else?

A. Okay. After that, he goes away and I just stood there and wait. Then he shows up again opening the cell to transfer us to the ACI. And I tell him, "Look, can you find me out if I can pay this right now, because they told me I can pay this right now. I have the money."

And he said okay, then he took the papers. He went

to find out what was going on. And he came back and said to me, "You had immigration problems."

And I said, "The other officer said to me that Immigration was gonna come back at 4:00 but they didn't."

And he said, "They just like that. They never showed up."

Q. I'm sorry, what -- this officer said what?

A. That Immigration never showed up.

Q. Okay. Did he say anything after that?

A. Yes, and I said, "When are they gonna show up?"

"Probably next day they gonna go visit you at the ACI."

Q. Okay. Was there anything else that he said to you?

A. After that -- no, he didn't.

Q. Was there anything else that you said to this officer?

A. No.

Q. Do you know either a name or a badge number or description for this officer?

A. It was pretty much my height. He was kind of Spanish looking but I was not sure if he was Spanish or not. But no, I don't have any badge number of him. But if I can see him again, I can identify him easy.

Q. Now, you said he's about your height. How tall are you?

Q. Okay, go ahead.
A. And he said okay. And he puts me in this cell. It wasn't that much a cell, it's like an office/cell. So, after that I told him to allow me to make a phone call. And then suddenly he shows up with the other guy and he said, "Who's the one claiming he is a U.S. citizen?"
And I said immediately, "I am."
And he said, "Oh, really?"
I said, "Yes. I am a U.S. citizen."
And then I speak up a little bit more higher because he had an attitude on me. So he said, "If you keep acting like that, I can make you stay here for the next five days."
And I just laughed. And after that the other guy came in and he said, "Okay, I got this, I got this, his case. I'm on it. You, you can go work on something else."
And then I just started laughing about that. And after that I make my phone call; called my friends, tell them that I was in Immigration offices in Providence.
Q. Were these the friends that were in court?
A. Yes.
Q. Okay.
A. So they took my passport, my Social, and my birth

certificate there.
Q. Your friends brought it to INS?
A. Yes.
Q. Okay.
A. As soon as they see that passport, they didn't even check the Social Security. They just saw the passport and they just flipped out. They started to apologize to me. "I'm sorry, I'm sorry." They took the cuffs out of me. And as soon as they saw the passport, they just hand it to me and started apologizing. And they said, "You set to go. You're free. Free to go." And that was pretty much it.
Q. Okay. Let me ask you, in this case you had filed a lawsuit against two types of people, we'll say; some of the state people and then some of the federal officers. Are you aware of that?
A. Yes.
Q. Okay. And you're aware that the federal officers are the INS people who picked you up on Wednesday?
A. Yes.
Q. Okay.
MR. DiMAIO: Can we go off the record for a second?
MR. FIELD: Yeah.

Q. You said that the state officers were being sued for something, for not doing their job; is that accurate?
A. Yes.
Q. What should they have done that they didn't do?
A. I think they should have checked my personal information better before putting an INS hold on me. And not allowing me because of that paying my due to them and go free.
Q. I just missed the last part of what you were saying. Paying your?
A. You know, the -- what the judge told me to pay the first time; the $311. He told me I can go free. But as soon as he says, "Oh, he has INS problems," I couldn't do that because the INS hold.
Q. Okay. So you think that the state officers should have done something to find out whether or not there was a hold on you, an INS hold on you?
MR. DiMAIO: Objection. That's not what he said.
Q. If -- I mean, correct me if I'm wrong, if --
A. The only thing I thought at that moment is that they should have checked everything before putting the hold on me.
Q. Okay.

going to ask you whether these state officers did something that they should not have done, in your opinion?

MR. DiMAIO: Objection.

Q. Do you understand the question?

A. Yes.

Q. Okay.

A. I think they should have listened to me when I told them that I was legal, that I was born here and that I was a U.S. citizen when I said it. And that I shouldn't -- I shouldn't be hold by INS being a U.S. citizen. They just let it, all that go. They just didn't listen to me, they didn't care about checking my personal information at that time.

Q. Is there anything else that they should have done that they didn't do?

MR. DiMAIO: Objection.

A. That's pretty much it.

MR. DiMAIO: I reserve the right to strike the answer.

Q. Your lawsuit indicates that you have suffered -- this is page 7 of your complaint -- have suffered great physical and mental suffering because of this incident. Can you tell me what that is?