Exhibit
2

A. Man.
Q. And do you know what the officer looked like; the officer's name or badge number?
A. Yes.
Q. Why don't you go ahead and --
A. He was dark skin. Not too tall, like five-eight. He was chubby, and his badge number was 158.
Q. Did you have any conversations with this officer from the time that he came to get you to the time they brought you up to the judge?
A. No.
Q. And you get up before the judge and what happens next?
A. The judge tells me what I was charged for and -- oh, first he asked my name and my birth date.
Q. Okay. Let me stop you. Do you know who the judge was?
A. No.
Q. But it was a male judge?
A. Yes.
Q. Okay. And I'm sorry, the judge asked you your name and birth date?
A. Yes.
Q. Okay. Go ahead.
A. And after that, he told me what I was charged for.
Q. Okay. You responded by -- with your name and your birth

Q. Okay.
A. So, as soon as he said that, I noticed that INS sign below the fine number, and later on, the officer next to me, I was cuffed at the time, he told me -- he brought me back inside and put me in the small cell.
Q. Okay. Let's go through this a little bit slower. You signed the paperwork?
A. Yes.
Q. And it was at this point that the judge said that you had INS problems?
A. Yes.
Q. What happened after the judge said you had INS problems?
A. The officer next to me called me and guide me back inside the cells.
Q. Now, was this the same officer that brought you up to the judge?
A. Yes.
Q. And this was the officer that you described as dark skin, chubby?
A. Yes.
Q. Okay. Now, he brought you back to the cell. Did he bring just you or did he bring other people, too?
A. Just me.
Q. Now, from the time that you -- from the time that you

left the courtroom to the time that you were brought back to the cell, did you have any conversations with this officer?

A. Yes. I told him that I can pay that fine, and he said to me, "You have INS problems." For that time, by the time he told me you have INS problems, I had another officer in front of me sitting down in a small desk. He actually asked me in Spanish what happened, and I --

Q. This other officer did?

A. What's that? I'm sorry.

Q. Excuse me, the other officer asked you in Spanish?

A. Yes.

Q. Okay. Go ahead.

A. And he asked me what happened. And I said, I told him that I was fined with $311 and that I was pulled over because tint windows. Oh, okay, he said. All right. That's the only thing he said to me. Later on they put me in a cell next to that same officer sitting down at the desk, and I was there like five minutes maybe, and then they take me back in to the big cells where I was before.

Q. Okay. Did you -- this officer that was sitting down that was speaking to you in Spanish, did you ever talk to him about the INS?

A. No.
Q. And the other officer that brought you from the courtroom, you had talked to him about -- did you have conversations with him from the time you left the courtroom to the time that you -- till you met this other officer?
MR. DiMAIO: Objection, asked and answered.
MR. FIELD: Go ahead.
A. Yes. I told him that I wanted to pay the fine, and he told me that I had INS problems.
Q. Was there any other conversation after that?
A. Yes, with the other officer in front of me in the desk.
Q. There was no other conversation with this -- with the first officer?
A. No.
Q. Okay. When you were in the small cell, other than the conversation that you just related with the officer who was sitting down, did you have any other conversations with this officer?
A. No.
Q. Did you have any other conversations when you were in the small cell with any other officers?
A. No.
Q. The officer that was sitting down, can you describe him?

talked about earlier or is this a new officer?
A. A new officer.
Q. Okay. So now we have another new officer?
A. Yes.
Q. And do you know what this officer looked like?
A. Yes.
Q. What did he look like?
A. He was tall, white. He was skinny. And he had bright hair. He was blondish.
Q. About how old do you think this officer was?
A. Probably mid thirties.
Q. And did this officer have a badge number that you noticed?
A. No.
Q. This person was in uniform?
A. Yes.
Q. And you called over to this officer and what did you say?
A. And I told him, "Can I speak to you for a second?" And he didn't say anything. He just walked by. And as soon as I see him coming back, I took my hand out a little window they had in the door and I told him, "Look this, I was hearing right now that this is immigration, and I'm a U.S. citizen. So I don't understand why I have

Adult Correctional Institution."

And I was like, "What?"

"Yeah, they're gonna transfer us right now to over there."

And as soon as I hear that, I tried to call one of the other officers. And he was a different one. And I tell him that I can pay that fine, and that I'm a U.S. citizen, and I didn't know what INS, it was for at that time.

And he said, "You should know."

And I said, "Well, I don't know, what does that mean? Tell me because they telling me that it's immigration but I'm not sure."

Q. Okay.

A. So he said, "Yes, it is."

Q. Did you have any other conversation with this officer?

A. Yes.

Q. What else?

A. Okay. After that, he goes away and I just stood there and wait. Then he shows up again opening the cell to transfer us to the ACI. And I tell him, "Look, can you find me out if I can pay this right now, because they told me I can pay this right now. I have the money."

And he said okay, then he took the papers. He went

Case 1:06-cv-00164-ML-DLM Document 28-3 Filed 02/08/2007 Page 7 of 31

to find out what was going on. And he came back and said to me, "You had immigration problems."

And I said, "The other officer said to me that Immigration was gonna come back at 4:00 but they didn't."

And he said, "They just like that. They never showed up."

Q. I'm sorry, what -- this officer said what?

A. That Immigration never showed up.

Q. Okay. Did he say anything after that?

A. Yes, and I said, "When are they gonna show up?"

"Probably next day they gonna go visit you at the ACI."

Q. Okay. Was there anything else that he said to you?

A. After that -- no, he didn't.

Q. Was there anything else that you said to this officer?

A. No.

Q. Do you know either a name or a badge number or description for this officer?

A. It was pretty much my height. He was kind of Spanish looking but I was not sure if he was Spanish or not. But no, I don't have any badge number of him. But if I can see him again, I can identify him easy.

Q. Now, you said he's about your height. How tall are you?

A. Five-eight.
Q. Is there anything else that you can use to describe him?
A. He was kind of overweight, too. He was big.
Q. About how old?
A. Mid thirties.
Q. And what type of hair?
A. Black hair.
Q. Anything else?
A. He was wearing dark uniform.
Q. Did he have any facial hair?
A. No, he didn't.
Q. So they -- you were put on a bus to the ACI at this point; is that right?
A. Yes.
Q. Now, before you got on the bus, are there any other conversations you had with any officers other than the ones that we have talked about today so far?
A. No, I didn't have any other conversations.
Q. And did you say anything else to any of the other officers while you were at the district court from the time that you arrived to the time that you left other than what we've talked about?
A. No.
Q. Okay. So you get to the ACI and what happens there?

just related?
A. No.
Q. And he had you line up somewhere with other inmates?
A. Yes.
Q. Okay. And at that point was there another officer?
A. Guiding us to another office, yes.
Q. Let me step back a second, actually. You said that you had to strip down and --
A. Oh, yes, it was two officers there. Different officers.
Q. Did you have to give your property, like your wallet and your necklace, did you have to provide that to somebody?
A. Yes.
Q. And was that to this officer that we just talked about?
A. In the front desk, yes.
Q. And did he give you a receipt for that?
A. Yes, he did.
Q. And they took your money and your wallet?
A. Yes.
Q. And --
A. Also my car keys and my ID.
Q. Okay. Let me show you what's page 2 of this Exhibit A, and it says Inmate Property Record. Is that the receipt he gave you?
A. Yes.

Q. Okay. Now, where on here --

MR. DiMAIO: I'm just going to object to the page 2 reference because maybe you can identify based on -- oh, you already did, I guess. Inmate Property Record. I'm getting there, sorry.

MR. FIELD: I'm bad, Joe, I'm not that bad.

Q. Where on here have you -- it has a place for inmate signature. Is that your signature?

A. Yes.

Q. Did you write on this document anywhere else?

A. Yes.

Q. And why don't you tell me where it is that you wrote?

A. My name. Initials.

Q. Okay. So you're pointing to the last column on the right that says Inmate Initials?

A. Yes.

Q. And it looks like there's an X and then an A or are these both your initials?

A. That was the sign, he put it so I could put my initials there.

Q. So the officer would put like an X?

A. Yes.

Q. And you put -- it looks like an A but, you know, whatever you say that's next to your initials?

A. Yes.
Q. So these A's are yours?
A. Yes.
Q. Is there anywhere else that you've written on this document?
A. No.
Q. You didn't write here last name, first name?
A. No.
Q. And it says here that you had $582?
A. Yes.
Q. Is that correct?
MR. DiMAIO: I think she did a bad copy job for me.
Q. Is that correct, Mr. Hernandez?
A. No. I had $588. I don't know why they wrote down 82.
Q. Did you have the 55 cents too?
A. Yes.
Q. So you had the same amount that you got from Pawtucket?
A. Yes.
Q. But this says you had $582?
A. That's why I was confused at the first time.
Q. Okay. You don't know where the other money may have been?
A. Actually, they counted in front of me, but for that time

I was taking my rest of the stuff off me that I didn't put that much attention on that. I already knew how much I had. But then when I put my initial there I didn't -- I didn't see that number there.

Q. Okay. So, you may -- you may have had $588.55?

A. Yes.

Q. But you signed for what's written there?

A. Yes.

Q. Okay. Now, you're lined up with the other inmates, and did you have any conversations with any officer at this point about INS?

A. No.

Q. When's the next discussion that you -- did you talk to any of the officers while you were lined up?

A. No.

Q. Okay. When's the next time you talked to an officer?

A. As soon as they taking our information, date of birth, if we had ID, and when they took our fingerprints.

Q. And this was like an Intake interview?

A. Yes.

Q. What did you say to this officer?

A. Actually, it was a female officer. She was taking all our information and also our picture. And I told her that if I could speak to somebody in charge, or her

boss, because I have an immigration problem. And as soon as she hears immigration problem, she mentions me, you know -- oh, I also told her I was a U.S. citizen and I had immigration problems. And she said, "You know what, Immigration just keeps doing the same mistake all the time. And I don't know, they just get into problems because of that." And I said, huh, so now I had a better reason to look for somebody in charge. So she said, "Okay, you can sit down over there, they gonna take your fingerprints, you can talk to him."

So I wait like five minutes maybe, and this other tall officer comes in. And he was white, wearing a gray uniform, and he was pretty much over 40 years old. And he asked me to send -- stand up and he takes my fingerprints. And I said to him, "Listen, I have a problem going on. I have immigration problems but I'm a U.S. citizen. I don't know if you can do something but I would really appreciate if you do because I don't want to be deported to Guatemala being a U.S. citizen."

And he -- he just kept taking my fingerprints. And I said, "Can you please, I can give you my Social Security number right now, you can check it out for me. I don't know if they already did, but I don't know what mistake was going on." I was so confused at that time,

I didn't know what was going on there. So I told him, "Please, check my Social Security number, make them know that I'm a U.S. citizen."

And he didn't say anything to me. And he just asked me to sit down again. Later on they pick me up and another officer came in. Oh, I'm sorry, the same officer that took me to that office took me back -- yeah, that was about the time they took us inside the Intake.

Q. Okay. Let me stop you for a second. This officer that you just described, the tall white officer, was there anything else that you had said to him other than what you just related?

A. No.

Q. And he didn't say anything back to you?

A. No.

Q. Now, at this point another officer takes you?

A. Yes.

Q. Now, you said this is an officer that you had already seen once?

A. Yes.

Q. Which officer was this?

A. He was one of the ones that were in the entrance of the Intake.

A. Yes.
Q. And then you, you spend the night there on June 16, right?
A. Yes.
Q. Now, June 16th is a Thursday. Are there any other conversations you had with any officers on that Thursday about INS?
A. No.
Q. What about on Friday?
A. Yes.
Q. Okay. Why don't you tell me about them.
A. It was one of the guards guarding that section, and I said to him that I needed to speak to somebody in charge. I don't know, some -- I don't know, some really on the top people, I told him. I don't know, your boss or somebody in charge of the whole facility, because I have immigration problems.

And then he said, "Okay, I'm gonna see what I can do for you."

But at the time, I was wearing a pair -- my pair of shoes. No, a pair of sandals, and he said, "I'm afraid I'm going to have to take those off because you cannot wear those in here." Somehow I got with those in. And he give me a pair of shoes and I said, "You know, I

would really appreciate it if you, you know, let somebody know that I'm not supposed to be in here because Immigration." And he said, "Okay, I will look for it."
Q. Did he get back to you?
A. No, he didn't.
Q. Okay. Now, this is a new officer, right?
A. Yes.
Q. What did he -- was it a he?
A. Yes.
Q. What did he look like?
A. He was small statured. He was white. He was young. He was like 26, 27. And he was wearing a khaki shirt with dark pants.
Q. Okay.
A. And he didn't have that much hair on his head either.
Q. Was there anything -- when you say he didn't have that much hair, was he bald or was it cut closely?
A. Yeah, cut closely.
Q. Was there anything else about this gentleman?
A. No.
Q. And you said he didn't get back to you?
A. No, he didn't.
Q. Now, other than this one conversation, did you have any

A. No, I didn't.
Q. Okay. Were you allowed to make any phone calls?
A. They told me that I had to put in some PIN number, that it takes two weeks to give it to me. And I said, well -- then I got worried because I was not allowed to make a phone call. So every time they let us out of the cells to go eat or watch TV, I tried to make friendship with one of the inmates, and I told him -- I told him my situation, and he said to me, "You know what, they never gonna give you a phone call, it takes forever. I've been here two months already and I just got my PIN to make a call." So he said, "You know, we can do a three way. I'm going to call my girlfriend, and you just give me your phone number that you want to call so that she can call them, all right?" And that's what we did. So, his girlfriend dials my number, and then we just speak -- she just put her cell phone on the phone, house phone, so I can speak to my friend.
Q. Okay. So you got to speak to your friend through --
A. Oh, no, I didn't speak to him. His girlfriend was speaking for me.
Q. Okay. But she -- but who was it that -- who was the friend that you wanted to call?
A. At that time it was my girlfriend.

Q. Okay. What was her name?
A. Evelyn Ruano, R-U-A-N-O.
Q. Now, she was on the phone with this other inmate's girlfriend?
A. Yes.
Q. Okay. So the three of you are kind of having a conversation?
A. Yes.
Q. And when was this?
A. That was Monday.
Q. Okay.
A. Like after 12:00.
Q. Okay, so from Sunday till -- from the time you got to the ACI to Sunday night, you didn't have any phone calls?
A. No.
Q. And the only conversations with officers that you had were the ones we've already talked about?
A. Yes.
Q. Okay. Were there any other -- there were no other conversations with officers?
A. No.
Q. Now, on Monday, did you have any conversations with any other officers on Monday, about the INS?

A. Officers, no.
Q. Okay.
A. But I did have a conversation who was in charge of making, you know, the phone call thing work out.
Q. And was this -- that was an inmate?
A. No. That was -- he was not wearing a uniform. He was an old man. He had a particular office inside that section.
Q. He was an employee?
A. Yeah. Yes, sorry.
Q. Now, what was his job?
A. To take our information inside the, the inmate section. Our cell number. They give us a particular number to us and that was pretty much it. And he was in charge to give the PIN numbers for the phone calls.
Q. Okay. What -- did you talk to him about the INS?
A. Yes.
Q. And what did you talk to him about?
A. I told him that I had an INS problem and that I needed to make a call. If I could use the phone he had in that office at that time. And he said that he was not allowed to let inmates use that phone. And I pretty much pleased him to let me use that phone because I had big problems. And he just didn't allow me.

to call again -- oh, I'm sorry. Yes, after -- half hour later we tried to call again. And my girlfriend already spoke to that inmate's girlfriend, and so I told her to tell my girlfriend the whole situation I was going through. That I was arrested and that I had immigration problems. And that I needed them to show up with my passport, my Social Security number, and my birth certificate. In inmate location. And she said all right. And what she did, she called my friend Gerson, and they went to my house and pick up my papers. And then they find out the date they supposed to show up, they let people in to go visit the inmates, they find out that date. So they showed up that day. But without my documents because they didn't let them bring inside the ACI any papers, any IDs, nothing.

Q. What day did they come to see you? Was that on Monday?

A. No.

Q. Okay. So you just had the conversation on Monday that you just related?

A. Yes.

Q. Is there anything else that you talked about that day other than what you just said?

A. Yes.

Q. What else?

Q. But do you know if it was before or after Sunday?
A. Which one -- Saturday probably.
Q. Okay.
A. Yes.
Q. And they weren't allowed to bring papers in to you?
A. No, they weren't allowed.
Q. And did you have any conversation related to your INS at that point?
A. With them, yes.
Q. And what was the conversation?
A. I told them that as soon as possible, they see someone in charge, tell them that I'm a U.S. citizen, to let them know that it's a mistake going on. And they said to me that they weren't even allowed to talk to nobody in the way in. So, they just said to me that probably they just gonna find out a lawyer for me and, you know, through that way let them know that I'm legal.
Q. So as far as you know they didn't talk to any officers or employees?
A. No, they didn't.
MR. DiMAIO: Objection.
Q. No, they didn't?
MR. DiMAIO: Objection as to form. I think it's a confusing question.

date but they thought I was gonna be there, so.
Q. So they're in the audience?
A. Yes.
Q. Okay.
A. They're in the audience. And the judge told me that the reason why I was there, and that I had -- that I needed to pay if I wanted to pay.
Q. What did the judge tell you?
A. I cannot recall that. The audio was difficult to listen.
Q. Was it the same judge that you had been before?
A. No.
Q. A different judge?
A. Different judge.
Q. And this is Sixth Division District Court?
A. Yes.
Q. Was it a male judge?
A. Yes.
Q. And the judge said something about you had to pay?
A. Yes.
Q. And what else, if anything, did the judge say?
A. And just that. But then after that, I said -- I agreed to pay, and they knew I had $588. And they said that if I wanted to pay in full, I wanted to give all my money

Security numbers, passports, even birth certificates."
I said "Just check my number, please."
Q. Were you alone in the van?
A. No.
Q. There were other?
A. Yes, two other guys.
Q. Okay. Now, at some point you're brought to the INS building. Are you released that day?
A. Yes.
Q. Okay. Now, you said they came to pick you up around 10:30?
A. Yes.
Q. What time were you released?
A. Like 1:30, 2:00.
Q. What -- obviously somebody checks the computer or does something to check to -- check your story out. Tell me about that.
A. Actually, at first I told him that I can give my exact Social Security number. But just -- he didn't listen yet. And I tell him, okay, let me -- allow me to make a phone call to my friend so they can show up with my passport and all my stuff.
Q. Is this at the building or still in the van?
A. At the building.

Q. Okay, go ahead.
A. And he said okay. And he puts me in this cell. It wasn't that much a cell, it's like an office/cell. So, after that I told him to allow me to make a phone call. And then suddenly he shows up with the other guy and he said, "Who's the one claiming he is a U.S. citizen?"
And I said immediately, "I am."
And he said, "Oh, really?"
I said, "Yes. I am a U.S. citizen."
And then I speak up a little bit more higher because he had an attitude on me. So he said, "If you keep acting like that, I can make you stay here for the next five days."
And I just laughed. And after that the other guy came in and he said, "Okay, I got this, I got this, his case. I'm on it. You, you can go work on something else."
And then I just started laughing about that. And after that I make my phone call; called my friends, tell them that I was in Immigration offices in Providence.
Q. Were these the friends that were in court?
A. Yes.
Q. Okay.
A. So they took my passport, my Social, and my birth

certificate there.
Q. Your friends brought it to INS?
A. Yes.
Q. Okay.
A. As soon as they see that passport, they didn't even check the Social Security. They just saw the passport and they just flipped out. They started to apologize to me. "I'm sorry, I'm sorry." They took the cuffs out of me. And as soon as they saw the passport, they just hand it to me and started apologizing. And they said, "You set to go. You're free. Free to go." And that was pretty much it.
Q. Okay. Let me ask you, in this case you had filed a lawsuit against two types of people, we'll say; some of the state people and then some of the federal officers. Are you aware of that?
A. Yes.
Q. Okay. And you're aware that the federal officers are the INS people who picked you up on Wednesday?
A. Yes.
Q. Okay.

MR. DiMAIO: Can we go off the record for a second?

MR. FIELD: Yeah.

(Discussion off the record)

BY MR. FIELD:

Q. What -- what do you contend or what do you believe the -- well, let me strike that. When I say state officers, I'm talking about the people at the Department of Corrections and the people at the district court, okay? Do you understand that definition?

A. Yes.

Q. Okay. So when I say state officers, I'm talking about those groups of people. What do you believe that those state officers should have done in your case?

MR. DiMAIO: Objection.

Q. I think you can answer the question but you can ask your attorney that.

MR. DiMAIO: I think it's a broad question, it calls for him to give a legal opinion.

Q. Well, let me ask it this way. You're suing certain state officers in this case, right?

A. Yes.

Q. And what are you suing them for?

MR. DiMAIO: Objection. It asks him for a legal conclusion and an opinion.

MR. FIELD: Well, I mean, he filed a lawsuit, he can say what -- I mean, it's admissible anyway for

these purposes.

MR. DiMAIO: Answer if you can in layperson's terms.

A. Not doing the job right.

Q. And what should they have done?

MR. DiMAIO: Objection, asked and answered. That's a different form of the last question.

MR. FIELD: Well, he answered what they didn't do. I'm just asking what they should have done.

MR. DiMAIO: If you know how to answer it in a layperson's...

A. No.

Q. No, you don't know how to answer?

A. No.

Q. You don't know how to answer the question or you don't know what they should have done?

A. Um, I don't know how to answer that question.

Q. Okay. I mean, is there -- you're basically suing -- well, you said you're suing them for not doing their job. What didn't they do that they should have done, or what did they do that they shouldn't have done?

MR. DiMAIO: Objection, compound question.

Q. Do you understand the question?

A. No.

Q. You said that the state officers were being sued for something, for not doing their job; is that accurate?
A. Yes.
Q. What should they have done that they didn't do?
A. I think they should have checked my personal information better before putting an INS hold on me. And not allowing me because of that paying my due to them and go free.
Q. I just missed the last part of what you were saying. Paying your?
A. You know, the -- what the judge told me to pay the first time; the $311. He told me I can go free. But as soon as he says, "Oh, he has INS problems," I couldn't do that because the INS hold.
Q. Okay. So you think that the state officers should have done something to find out whether or not there was a hold on you, an INS hold on you?
MR. DiMAIO: Objection. That's not what he said.
Q. If -- I mean, correct me if I'm wrong, if --
A. The only thing I thought at that moment is that they should have checked everything before putting the hold on me.
Q. Okay.

going to ask you whether these state officers did something that they should not have done, in your opinion?

MR. DiMAIO: Objection.

Q. Do you understand the question?

A. Yes.

Q. Okay.

A. I think they should have listened to me when I told them that I was legal, that I was born here and that I was a U.S. citizen when I said it. And that I shouldn't -- I shouldn't be hold by INS being a U.S. citizen. They just let it, all that go. They just didn't listen to me, they didn't care about checking my personal information at that time.

Q. Is there anything else that they should have done that they didn't do?

MR. DiMAIO: Objection.

A. That's pretty much it.

MR. DiMAIO: I reserve the right to strike the answer.

Q. Your lawsuit indicates that you have suffered -- this is page 7 of your complaint -- have suffered great physical and mental suffering because of this incident. Can you tell me what that is?

MR. DiMAIO: Objection.

Q. If you know.

A. No, I don't know.

MR. FIELD: Okay, I think that's it.

MR. DiMAIO: Just one thing for the record. Based upon his testimony, I'm going to probably send a written request for production. I know that production closes on Monday, but just to give you the heads up, I'm going to ask to see if you can get the ACI to give copies of the visit records for anybody that may have visited him, that may help us hone in on stuff.

MR. FIELD: Yup.

MR. DiMAIO: And there might be one other thing, let me just finish reviewing my notes. (Pause) I guess better identities of the people that actually spoke to him. He did his best to identify them. And --

MR. FIELD: Go ahead.

MR. DiMAIO: Did you receive my request for identification of the different individuals identified in this affidavit?

MR. FIELD: Yes.

MR. DiMAIO: Okay. I'm going to --

MR. FIELD: Do you want to do this on?

MR. DiMAIO: Yes. I'll send you another

request asking, you know, to the extent you're able, based upon the time and place that he's testified to, to further identify by name, address, in some fashion that I can -- if I have to serve process. I understand that correctional officers are very touchy about giving out their home addresses. So long as I have some way to serve them so that we don't delay the proceeding.

MR. FIELD: Give the business address, yeah.

MR. DiMAIO: Someplace I know I can have them served. If necessary, I'm going to double check, based upon his testimony, whether there are any additional people that should be identified in the amended complaint, perhaps as a John Doe for the time being.

MR. FIELD: Okay, that's fine. I'm all set with the questions. I just want to double count these again, I came to a different number. So other than that...

MR. DiMAIO: Go right ahead.

MR. FIELD: If that's a different number I just want to put that on the record.

*(Counsel counting documents)*

MR. FIELD: I've just counted the documents twice and I think that there are 54 documents instead of 55. With that we're done.